by the Convention, Case law interpreting the Convention, or any logical extension of it. I'm sorry, before you Debbie, I apologize for interrupting you, I'll go right back to where you are, but I just have a fact question. Certainly. Has her contract been renewed or not? Yes ma'am. By the IDB, they've approved it or she submitted it, I'm sorry. I didn't mean to interrupt you ma'am. The contract was renewed I believe in late spring prior to the trial. There wasn't, I believe your question is stemming from a discussion that occurred on the record, and perhaps statements made in Applebee's brief about whether or not a new formal contract, similar to the one that was in evidence, was signed. However, the renewal took place by email with Dr. Stanevaskis and what I imagine was the Human Resources Department, but I can say for sure that her contract was renewed early in 2019. To extend until when? It extends for another 18 months, so July of 2021. Okay, thank you. And those emails are not in the record? Because there was a request for production of evidence of the new contract. Are those emails in the record or not? The emails, I do not believe that the email between her and Human Resources is in the record, but on her examination in the trial court, she did make representations. She testified to the fact that she had corresponded with... Right, she corresponded, but whether the bank had answered back and said, yes, we want you extended, is what was missing from what I've reviewed in the record. That's why I'm asking the question. Yes, I understand, Your Honor, and I believe the, I do not believe there's an email in the record, and I believe that the evidence that was taken was her testimony that she had gone ahead and renewed the contract, but there is no email that I'm aware of. Okay, I'm sorry I interrupted your opening. No, that's fine, Your Honor. Thank you. Dr. Albrecht Heider's claim is not recognized in case law or any logical extension of it. Indeed, it's not recognized anywhere in the world. It's essentially an inchoate or unfinished claim under the convention, and he's seeking to create a new cause of action by bringing it, which would lead, which is not consistent with the plain reading of the treaty, which should be read in the same way that statutes are read, in the sense that specifically the treaty's not written in the future tense. It's also inconsistent generally with the policy of the Hague Convention, which requires that a retention actually have taken place at the time that the, or excuse me, requires that a retention has actually taken place at the time that the relief is sought. How is what happened here different from what happened in Moses? Well, Moses was quite different actually in many respects. Moses factually was very different. You had what was an undisputed sort of cultural excursion to the United States from Israel by the Moses family, led by the mother. Children went with her. It was supposed to last for 15 months. It was undisputed that the original period of time was 15 months. Here the district court found that the plan here was for 18 months, and he found that the couple did not have a plan to make the United States their habitual residence, but planned to return to France. So it may have been disputed, but now it's been resolved by the district judge. The analysis applied by the district judge, I believe, put an undue weight on the shared intent of the parties, and if you look at the Moses analysis, Moses is kind of... Wait, wait, wait. You agreed that Moses is the governing analysis for purposes of this case. Yeah, and to distinguish agreeing that the Moses analysis applies with the result in Moses... No, I give you that, but you just objected, I thought, to focusing on shared intent that the Moses analysis does, so you can't object to that mode of analysis. Well, with respect to the analysis, what we argued was that, and just to maybe lay the backdrop of the Moses analysis to begin with, shared intent to relocate plus geographic change plus pre-school period of time yields change in residence. If there's a dispute as to the shared intent, then neither party should be taken at face value, and you have to look to the rest of the record. I also asked Judge Matta to examine acclimatization, and we did not ask him to place any specific weight on any part of the analysis. We're simply arguing that Moses, which has been followed in some way, shape, or form by nearly every circuit that applies the test for habitual residence, was part of that analysis, and I think that is actually a critical point. We put this in our proposed finding of fact and conclusions of law, that it was not simply the shared intent, but it was also the acclimatization, and we did not ask for a specific weight, and I believe that that's also consistent with the way the case law is developed, and where the case law is headed. We're not talking about... I get that there's issues in the Supreme Court, and a lot on that, but you know, a lot of parties have come to us and said, we agree that the Moses analysis is the one that applies here, so you all have already said, set for us the framework you want to use. So it doesn't... I don't know how you can now come up and argue for the first time, not in your brief, that you think there should have been a different analysis with more emphasis on acclimatization. Well, actually, I'm not... I want to be careful the way I'm saying that, because I'm actually not arguing something that's different in our brief. All of these tests are, let's say, applicable. It completely depends on the facts of the case. For example, the clearest test that would be applied, that wouldn't apply in certain situations, is the acclimatization test if you have a child that's too young. The Moses test is... Actually, this is where I believe the district court's ruling, or we respectfully believe that the analysis was lost, is at the first step. Yes, you can still examine shared intent, but that doesn't mean that you apply Moses as this mold on the case. You have to look to the rest of the record, and that... You look broadly at the record and many detailed findings of facts, and I'm a little bit unsure what your position is, because in your brief, you argued that the parties need not have the intent to accept Washington, D.C. as their habitual residence in order to abandon France. You talk about the prospect that they might move to Uruguay, and the record shows that that was, at one point, something that we're considering, but to where are you claiming is the habitual residence? Currently, Washington, D.C. But you said they don't have to have the intent to accept Washington, D.C. That's correct. Are you claiming that there is, that the record, that the district judge was clearly erroneous in failing to find a shared intent to make Washington, D.C. their habitual residence? Failing to find a shared intent and failing to... In the method that you applied the analysis, yes, because there was a disagreement as to whether, between the parties. One party says, no, it was just for 18 months. The other said it was for at least three years and we were never going back. Right there, Moses says, you have to look to the rest of the record and you cannot take... To determine what the parties, when the parties last had a shared intent about habitual residence, or when, what that shared intent was at that time? In attempting to determine it, yes. And so, in what respect does the district judge fail to do that? The district judge actually, the proper test for habitual residence, actually, the district judge left out the first step. And this goes back to my argument for anticipatory retention. The first step in the analysis is, is there a removal of retention without respect to whether that removal of retention is wrong? Is the child being retained somewhere? Now, back to anticipatory retention, a child absolutely cannot be retained in a jurisdiction in which the child resides, and resides today, while this case is on appeal, with the undisputed consent of both parties. That was the case in Moses. The mother went for the 15 months with the consent of the father, and was in Los Angeles with the children, and it was when the mother says, I'm not planning to come back, I'm filing for divorce, that it converts it to wrongful, what's the term? Retention. Retention. And there's a difference between that analysis, what your Honor is referring to, the analysis that allows the court to set the date that the wrongful retention began, so that a party cannot take subversive action to create a new habitual residence. That's being conflated with a claim that Dr. Albrecht-Harder filed before there was even a retention. His case was... He filed his claim before the 15 month period was up. It was decided after. It was decided in August. What difference does that make? For jurisdiction, we determine jurisdiction as of the date of filing. In particular, in this case, when you look at a brightness issue in the context of the convention, I believe you have to look to the temporal guidance that the convention provides, in addition to having highly expedited proceedings. What case can you cite that says that we determine subject matter jurisdiction as of the date that you decide the issue, as opposed to the date of the filing of the complaint or petition? I don't believe the ripeness doctrine is that rigid. I believe that the ripeness doctrine would allow for a case that could be, a claim that could be decided, especially within the six week temporal component. Can you name or identify a case, or was there one cited in your brief? The cases that we cited for ripeness were the DRT case, and the other administrative... They were all administrative agency appeals, which this court often hears. It just doesn't make any sense, where the parties know that they're at loggerhead, and one has taken legal action to change the custody situation, and the other is opposed to that. The issue is teed up, and if we were to wait until the end of the agreed upon period, it's way more disruptive for the child, and it just doesn't make sense. What's gained by that, and particularly in this case, where in two weeks, even under your view, the case will be right? In two weeks from now, as we sit here on appeal, this case was filed in June, and I... But we're talking about, you know, whether there's something that needs to be decided. I didn't quite follow whether it would be decided. Could you please clarify, Your Honor, the last... Whether there's something that should be decided now? Yeah. Oh, well, actually, I would look to... I believe it's the Redmond case that speaks to mootness, or excuse me, chafing, the Supreme Court case. There absolutely is an issue to be decided, just because even if this court couldn't grant... affect the parties in an extremely substantive way, and chafing, or rather, the mootness issue, which is, I would say, akin to the rightness issue, this court is... The court was not capable of granting relief, or excuse me, maybe I'm thinking of... You're no longer contesting that there's a lot of dispute before. I mean, it's a very odd posture, because it's you and your client who have sought our expedited review, even as you say it's not right, but it seems like the expedited review speaks more to, yes, there's something to be decided, and indeed, it would be good if it were decided before the end of the agreed-upon period, even though it's no longer agreed. I don't quite follow that, Your Honor. The reason that we sought expedited review is because the case, in addition to these cases being brought under the general mandate is that they be heard in an expeditious fashion, but in this particular case, our claim, if we were to prevail here, would actually prevent the entire... So you want us to very quickly hold that it's not right, and then have the father file again in two weeks, and begin the whole thing over again? I'm saying that in June, he did not have a prima facie case, because he could not prove that a retention actually took place. That's where we get back to Moses, because even if we assume that they had a shared intent to stay here until December 31st, what Moses and a long line of other cases have said is when one party interrupts that shared intent with a legal filing that seeks to alter custodial rights, as occurred here, you've got your retention. That's exactly what happened in Moses. They agreed on 15 months. Before that time expired, a filing was made that sought to alter custodial rights. You're identical. That's not anticipatory. What it is, is they agreed on 18 months. They did not agree on 18 months of the change in custodial rights. There's actually significant doubt. The judge might have completely rejected the Dr. Abu-Hadir's testimony that he was only coming here for 18 months. Our argument is that in the middle of an agreed upon... It doesn't matter, because it didn't matter, because what happened here is there was an custody complaint was filed in Superior Court, and in fact, changes in his custodial access to the child occurred. No changes actually occurred, Your Honor. He was living in the house when he was in D.C., and after she filed, she excluded him from living together with the family in D.C. That's a change. He made a unilateral decision to move back to France. She said you can't live in this apartment anymore. You're not on the lease. You're not welcome. Meeting you in a park. A change to the locks. Absolutely. There is evidence in the record she denies changing the locks, but I want to stick on a minor point. I think the bigger point here is that what we're doing is... This goes back to another argument that we're making, that Moses is factually distinguishable entirely because this is an initial determination of custody and an initial breakdown of the marriage. There were no actual... How is that different from Moses? In Moses, the parties... Well, actually, she did file for... Yeah. She did file for divorce, but... And that was the retention, was the filing. That's what Moses held, was that whatever their shared intention for 15 months, that was interrupted. Everything got blown up by the filing of the custody thing because that seeks to alter custodial rights. And it seems like in this case, your brief talks about she gives him visitation, but before she filed and kicked him out of the apartment, she didn't give him visitation. He didn't need visitation. He had full physical as well as legal custody. Shared, joint custody. Her testimony was that he was free to see the child whenever he wished. Why would she have any right to get permission? Well, I would answer the rhetorical question. Is it then corollary to that, that no parties can ever have any... After she filed and said, and told him, I plan to keep the child here, could he have taken the child back to France? Or do you have to have the other parent's permission? Well, under District of Columbia law, you would need the other parent's permission. Okay, so what happened, what certainly happened here, is he lost the right to take his child back to France. That's not true. He lost... You just said you would have to have, under DC law, you'd have to have the permission of both, and she withdrew it. The District of Columbia Superior Court has jurisdiction to allow the child to return to France. Right, but he doesn't have control anymore. When she filed, he lost that right to move the child. Well, arguably, that would be up to a DC Superior Court judge. I'm asking, you just don't know what the law is. The law changed. When she filed that custody complaint, his ability to travel with his child was gone. She said, I will not consent. That changed everything. But that was not an alteration of her position from the outset. That was a retention. And whether or not... Let's assume that a retention took place, that retention is not wrongful. I would argue that it can't... You still have... Let me go back before I make the assumption and proceed with the analysis. Even after all of these things happened, Dr. Abu-Haidar did not dispute that he still consented for the child to remain here. No, no, no. Let's be crystal clear what he consented. He consented on the assumption that he was still a full and equal parent, that they would be here for 18 months. I see nowhere, if you can point me to it, I would value it, where he consented to the child staying here for the full 18 months when she was no longer a full custodial parent. And in fact, his petition asked for immediate return. Can you show me where he consented once he lost his full custodial rights through this filing, once things changed. He still consented to going to the end of December? For his application to the central authority in France. He filed a petition, that's the thing you're talking about, that says, I want immediate return. Everything has blown up. Everything has changed. This is nothing I ever agreed to. His petition does ask for immediate return, correct? I believe so. Yes, and that was June. So how can you say that today he still agrees to the child being here until December 31st? It was undisputed throughout the record and also... No, no, no, what was undisputed was what you're talking about, and we have fact findings from the district court here, but what you're talking about is when they first came. You're making the habitual residence argument. Correct. When they first came, that was the plan. Yes. Now, but when they first came, he agreed the child could stay here until December 31st under a scheme where he would be a full custodial parent, able to travel with his child. I would disagree with that conclusion respectfully and say that was with, I believe, an accurate synopsis of judgment as ruling is that that would be within a period of potentially much greater consent and that those were the only parameters that Judge Metcalf could be certain of, and he tied it back to the 18-month contract. So we've taken the entire shared intent analysis as focusing around his job and the length of her contract as opposed to looking at... He looked at a lot more things than that. You have to acknowledge that. He looked at how they left France, what they left in France, what was said to people, witnesses that he credited. Well, I believe that in applying the habitual residence analysis, the habitual residence is kind of wearing two hats in a funny way. You read the case law and it says it's a mixed question of law and fact, and then it goes on to say that generally speaking, this four-part test determines habitual residence because courts typically address the four steps in the test after they talk about habitual residence, whether there's a retention. And then step two is, where's the child's habitual residence? Well, steps one and two are fact-finding exercises. Step three, is there a breach of custody rights? That's a question of law. And step four was the exercising custody rights. Well, what are the facts? The extensive facts, where the habitual residence is, is a heavily factual inquiry. I don't think anyone disputes that. You can't declare it as a matter of law, like nationality. You have to find facts. But when the district court finds a litany of facts, like the district court did here, and says those add up to finding that there was no abandonment of the habitual residence in France, that's making a legal conclusion based on the facts. Correct? As the law is stated now, but I believe you still have to... Excuse me, as the law is stated now, and as you stipulated would govern this case, when you said you stipulated that Mathers is the governing paradigm for this case. It is, Your Honor. But Moses has been interpreted much more broadly. The test is not... We didn't argue for a specific weight on any particular part of the test. You can have acclimatization. It's quite sort of context-dependent. It is, Your Honor. Can I just back up a bit? It seems to me that the way that you're understanding the question is really bound up with a notion that there was no wrongful retention. Step three. And I think... I mean, it is a little bit counterintuitive that it's referred to as a wrongful retention where things were going on as they had been. It's not like she up and took the kid and went off to Uruguay or Canada. And typically we don't think of resorting to the civil courts, the local D.C. Superior Court, as a wrongful action. Everybody has the prerogative to go to court. So I hear you resisting the idea that there was a legally operative wrongful retention under the hate convention in this case. And that really your whole case in a way rests on that. Partially. We are advancing the anticipatory retention argument as well, but if I could speak directly to Your Honor's comments, that would go to step three, which is a legal question. Was there a breach of the custody rights? And if you look to the law of the District of Columbia, and you look to the law of France, as specifically highlighted in my reply brief, going to a local tribunal and saying, hey, we just, we were having severe... You forfeited that issue. Judge Mehta specifically asked you below, what do I have to decide here? Are you, what are you contesting? And you said that you weren't raising any issues with respect to whether this was a violent, whether there had been actually an alteration of his custody rights under French law. That's why he said that he didn't have to decide that issue because it had been stipulated to or it had been conceded. And then in your brief, you try to say, well, we never conceded that. And I look at the transcript, and you did concede it. I don't believe that we did. Judge Mehta was speaking in hypotheticals. No, he asked you a question. I'm trying to figure out what I have to decide and what I don't, which is what conscientious district court judges do to figure out what is it that I need to decide. And so, he's asking you as a person bringing the petition, do I need to decide these other issues? And you said no. I did not... You didn't say no explicitly, but if you look at it in context, you said no because you didn't say a word about this issue as being one that he had to decide. Whether there was a breach? I believe the question was if there was a finding of wrongful retention, would there be a breach? And you have to find a breach for there to be one. And we certainly conceded that he was exercising his custody rights at the time that this was all happening. And I do remember... Excuse me, Judge Pillard, were you about to ask a question? Go ahead. I believe I was done substantively. So, I think that the way the case law has read that, breach of the rights of custody, there are a bunch of cases that really talk about or seek to change, where somebody unilaterally is saying, whether it's the mother in Los Angeles and Moses, or there's a range of cases where somebody says, okay, now I'm going to court in a jurisdiction that the other parent perceives not to be the habitual resident and seeks to get that court to act. And as I was saying, even though we don't typically think of that as wrongful, I think it's the unilateral quality of it that the law is labeling as wrongful in the sense of an assertion of an effort to change the legal status. And really, when you think about it, the Hague Convention is an effort to make a forum choice for this family and this child. We don't want to just have a race to the courthouse around the globe and have somebody pick a forum where they think they're going to be able to prevail. We're going to go to wherever this family position of residence is. So, I think if you get beyond this notion that her acts are wrongful in some more basic sense, she is very clear in expressing an intent to change the custodial arrangement and then the question is, is the D.C. Court a place where they haven't jointly agreed to go? It would be a different thing if they both went there and we would have a case, or if they both went to mediation, which is where they really should be. So, I just, you know, I'm pushing back on your sense that, well, because it's part of your rightness argument, I think, and part of your argument that there somehow isn't a wrongful retention even if you preserve this issue. Yes, Your Honor. I'm sorry. I just want to make sure you're finished. So, I think what strikes me most about Your Honor's comments are that in every single one of those cases that I believe you're referring to, the facts were very different and that most of these cases arise when, say, a parent is traveling on vacation. The Marks case is a great example. A three-week trip from Thailand to see a sick relative return plane tickets have been bought. It cannot possibly be clear. Filing for custody, in that instance, would strike any reasonable person as offensive and in breach of custody rights because not only is there an element of filing for custody, but it's based on what is essentially a lie or subversive behavior. In this case, there's no subversive behavior. There's no lie. There's months of marital strife. Well, there's the... Oops, did I forget to tell you that you're not on the lease? You have no right to be in this apartment. I can absolutely speak to that, Your Honor. There were two apartments. The first one, he was on the lease. The second, he wasn't. The first one, he had to be on the lease for immigration purposes. The second, he denied this at trial, but Dr. Sanabaskias' position is that he needed to be left off it because, one, he no longer needed the immigration papers, and two... Did she tell him? Did he? I thought that he wasn't aware. He did not want to be on the lease because it would affect his eligibility for a tax credit for an apartment that he owned in Paris. He denied that. What am I missing about the decisions? The cases Mark, Valencia, Blackledge, Dieron, case after case where the non-custodial parent says, hey, you know, it's not working out for me. I'm going to stay. I'm going to stay in the U.S. I'm going to Mexico. They just... None of those cases involve... I'm sorry, Your Honor, are you interested? I don't want to... Yeah, I'm interested in how you distinguish them. Absolutely. None of those cases, first of all, involve situations where the parents are living together as a couple or husband and wife, and Valencia is actually... Why does that matter? Well, I think there's a difference between coming to a new jurisdiction as a family living together and then having marital strife that occurs while you're living there as opposed to... Why? Pardon me? Why? Well, in making the factual determination, it's just simply... Going back to what I said to Judge Pillard's comment earlier, it's just simply less offensive. When you have a... I'm pretty sure that Dr. Abahayer doesn't find this non-offensive, and I'm not sure what the degrees of offensiveness have to do. Well, with respect to interpretation of the facts, Your Honor, and if I could make a point about Valencia, while it was just brought up, the Valencia Court at page 1342, which Dr. Abahayer says in his brief crystallizes the current state of the habitual residence analysis, notes that a period... They did not start the period of retention during the period of consent, meaning the one-week trip to Mexico. It started later, and it specifically references the page 13... But that's not this case. That doesn't help you. Well, with respect to... During the period of consent. There's like a 10-day difference in this record, in any event. Does the intent to wrongfully retain or the day the petitioning parent learned the true nature of the situation? It doesn't make a material difference in this case which of those you pick. The point is that the petitioning parent, the non-petitioning parent made a decision, took unilateral actions, including starting a legal process without the knowledge or consent of the other parent, and then a few days later he learns about that. Whichever of those dates you pick, which is the dispute that you're referring to on page 1342, you don't have a claim that there's no wrongful retention here. Whichever date... Yes, actually we would, because in the analysis there's no retention. The wrongful retention occurs at step 3, essentially, where you determine if the retention has breached the custody rights of the other parent. Well, let's look at what you said at page 650 of the appendix. Judge Mehta asked you on the prior page, are you relying on at all the defenses of acquiescence or consent? And you say no, and then you say we're not disputing that. Well, we're arguing that we're not even getting to the point where your Honor would see the side of custody rights were violated or not. Clearly he has them. No one's disputing that, and clearly he has not acquiesced right. And then he talks about how he's just trying to figure out what he has to rule on or not. And you say, well, our defense is that this case isn't right, and that's the only thing you have to decide. Your Honor, Judge Wilkins, I would respectfully like to put that into context for you. First of all, we're not it was the acquiescence or consent in the context that Judge Mehta was seeking, that I understood his question to be was, after the fact, as an affirmative defense, are you saying that the other parent consented or acquiesced? Well, at the point where we're at the end of the trial, with a, you know, after the Hague just filed, no, but that is to be absolutely distinguished from the initial consent that where it's undisputed. What did you mean when you said you don't have to decide if custody rights were violated or not? I'm sorry, Your Honor, could you please refer me to the line? 650, lines 45 and 6. Certainly. So that's a reference to our our first argument is the jurisdictional argument. There's no claim for anticipatory retention, and then so How is telling the judge that you don't have to decide whether custody rights were violated or not, what does that have to do with there's no claim for anticipatory retention? Well, if you if there's a finding that there's no claim for anticipatory retention and the case cannot proceed on those grounds, and you don't reach the point in the in the habitual residence analysis where step three where you're determining if there's a No one is disputing that he had custody rights and clearly he had them clearly he was exercising them throughout this entire period and still is today and the acquiescence statement that I made and perhaps this would be a more effective answer for you Judge Wilkins if I said this was perhaps  of Judge Metcalfe's question and perhaps I should not assign that. Either way I did not mean that. Let's put this aside. Certainly. I'm trying to understand what would happen if we decided the case as you would like us to. Let's suppose we were to dismiss this case for lack of jurisdiction. It's filed again on January the 1st of 2020. It gets assigned to Judge Mehta again and he makes the same factual findings. You're saying that he would have jurisdiction he could find wrongful retention as of May 2019 and he would do the habitual residence analysis as of that date. You're saying that that's the way that it would work or he'd have to do the habitual residence analysis as of January 1st 2020. How would that work? Well, the analysis without conceding our obvious disagreement with the result, just to keep it on the analysis level. The wrongful retention, the date the retention becomes wrongful, we're not disputing, can be backdated to where a judge finds that, makes a finding that the retention became wrongful. Even though he can't file until January the 1st, under your view, January 1st is not the earliest date that he or a judge could find there to be a wrongful retention, under your view of how the law should work. Correct. I think it is consistent with cases that we've read, cases that Dr. McIntyre cited, cases in England and other member states that the distinction between anticipatory retention as a shorthand for backdating and a claim in and of itself and to allow for the claim to proceed would yield unacceptable results, absurd results in some cases. Okay, let's suppose we agree with all of that. Okay, and so in this new lawsuit that's filed on January the 1st, the judge finds that the wrongful retention date is May the 10th. Under your view of the law then, would the judge do the habitual residence analysis as of that date, or would the judge use the January 1st filing date for that analysis? Well, one quick clarification just to make sure I'm on the same page as you, is that we well, okay, the short answer to your question is yes. You can backdate the date of wrongful retention, not conceding anything that we believe in this case. A court can do that, or else you would also have absurd results because you would allow subversive, you would essentially reward subversive conduct by parents. Now, likewise, So if you pick the May 10th as the wrongful retention date, you would do the habitual residence analysis as of that date, yes or no? The habitual residence analysis, so the analysis is sort of a broader thing. I'm saying that a court would be, a court could find a date, the date that predated. So sort of yes with explanation is the answer. I believe that that's what you're asking. It's the habitual residence? This is where I'm getting a little, this is where I'm getting a little bit thrown myself, in that I think it's Well, let me clarify. Sure. The case law, as I understand it, says that we determine what the habitual residence was immediately prior to the wrongful retention. Correct, Your Honor. Okay. So if the wrongful retention date would be May 10th, in my hypothetical Actually, Your Honor, excuse me. If I could back up. The only reason I interrupted  slightly. I thought you might. The analysis, it begins with retention. Then you look at habitual residence. Then you look to whether there was breach. That's what determines who was wrongful if they're exercising their custody rights. In Judge Menton's opinion, he actually made the determination that wrongful retention comes first, and then he analyzed habitual residence. And that's how the analysis sort of flows in his opinion. Now But isn't that the way all the courts do it? As Judge Wilkins was saying, you, in order to pick what the benchmark is for the analysis of habitual residence, you look as of the time where what was a concordant family unit Where's the fork in the road? Where the two parents are no longer in accord on custody rights. They don't want One of them has said, shot across the bow, things have changed. And it's at that point where you ask, okay, what's the habitual residence? Because that's the expiration of the joint family unit. Provided that the split that Your Honor referred to would amount to a retention. Because I would go back to the analysis. But that's like a wrongful retention. So you're saying, yeah, exactly. He's looking at it and he's saying, I'm going to look at when there's a wrongful retention, and I'm going to measure habitual residence from that point. That's actually taking the test out of order. All the courts seem to look at it that way. I mean, how can you tell what habitual residence is unless you have a time from which to measure it? You do, from the time of the retention. You haven't gotten it wrong on this analysis. The wrongful retention is one analysis. This is where Okay, so this is where wrongful retention and habitual residence I referred to it as habitual residence wearing two hats. The factual determination of step two and the overall analysis is sometimes referred to as the habitual residence analysis. And they refer to it as a mixed question of law and fact. Nobody really disputes that the determination of step two is primarily factual. It has to be. So when you talk about wrongful retention, Your Honor, I believe you're talking about the former, if you will, hat that I was referring to. It's the analysis. You need those four steps to determine if there's a wrongful retention. That's the wrongful retention analysis. Habitual residence is part of it. So what we're saying is that you don't obviously, as I stated before, you don't have a retention, so you stop there because it's anticipatory. Not in the sense of back dating the date that it may have begun, but because you cannot possibly retain a child in jurisdiction. I don't understand how you can say we don't have a retention. Do we have to do retention first? Absolutely. And we don't have the retention even though on January 1st or 2nd, a court could find that retention happened sometime in May 2019. It could. Here's another example, Your Honor. That makes no sense to me. You just said we have to find retention first, but we all have to keep our eyes, ears, and mouths shut and closed until the magic day of January 1st. And then we can go and it already happened back in May 2019, and you're calling that anticipatory. The short answer is yes, but if you sort of look at... How does that make any sense at all? Well, if you... You're allowing someone to have a wrongful retention for six or seven months under your theory, and then you're calling it anticipatory. You're having a retention. And respectfully, Your Honor, I would submit that it cannot possibly be wrongful during a period of undisputed consent. As it stands today. You totally disagree, Ben, with all the cases Judge Pillard referenced, including Moses, when they found that, in fact, you can have a wrongful retention during a period of consent because the custodial proceeding or the articulation of a refusal to return at the end of the agreed-upon period, either one of those changes what was agreed to. That's a change in the agreement. You're rejecting all of those cases. Every one of them is the same as this. Timing-wise. With timing, I think the timing is actually quite different in all of those cases. In Moses, they had an agreed-upon period of, what was it, 15 months. Before that 15 months, before their December 31st, whatever the equivalent date was, before their December 31st, a custodial petition was filed. July, yes. Correct. I don't care what date. It was before. And that was held to be, notwithstanding the agreement to stay there until the 15 months, which is the equivalent of your December 31st, it was held to be a wrongful retention. A retention and a wrongful retention. And that could be decided. There was nothing anticipatory about it. It happened. And you disagree with that. In your view, what Moses should have done was wait until the end of the 15 months and then file a petition and then the court would go back and say, lo and behold, a wrongful retention happened six months ago during the agreed-upon time period. I wouldn't go as far as Your Honor has described it. We're not asking for a bright line rule, but it should be within a time that the claim could actually be decided. So by the time it's heard, at least that day has passed, especially with this six-week mandate and the expedited proceedings. Well, a case is ripe if it can be... I believe it would allow for flexibility. A case is ripe if someone's injury is concrete and the issues presented are concrete. The legal test that would define that injury. That's what ripeness means, yes. If all these case courts have said that an injury occurs when one spouse, without the consent or acquiescence of the other, either announces that they will not return with the child at the end of the agreed-upon period, or files a legal proceeding to change custodial rights, you have both here, then that constitutes a wrongful retention. That can happen within the custodial... within what had previously been agreed-upon as a period to stay there without changing my custodial rights. Under the facts of certain cases, yes, and under the facts of other cases, no. There have been other cases where there's been extensive litigation related to custody and visitation prior to any hate petition being filed, and the federal district court takes it up without regard. What court of appeals case adopts your ripeness theory? Is there any federal court of appeals case that adopts your ripeness theory? With respect to anticipatory retention... Under this convention. I don't believe so. Well, excuse me. In our brief, we cited an Eighth Circuit case that recognizes the concept of ripeness in the convention context in our opening brief. That's what I asked. There's ripeness in other contexts. I'm talking about your ripeness argument here. With specific... specifically I'm pointing to anticipatory retention I assume is what Your Honor means. No, this is an issue of first impression. People don't typically... It's not first impression. This has come up in all of their circuits. None of them have... they've all found... had no trouble finding a wrongful retention during the agreed upon time period. It's not first impression. You're asking us to create a conflict with all of those other circuits is what you're asking us to do. I'm asking the court to draw the line and say there's no... that anticipatory retention as we've been discussing in the context Your Honor made does not give rise to an independent claim. I just have one more quick question for you. I think we're way over your time. Thank you for your patience. You said that D.C. law requires... I guess once she filed a custodial petition D.C. law required consent to take the child back to France? To relocate you would need... you would typically need consent. Is that a consequence of the filing of the custodial petition? I'm sorry. Is that a consequence of her filing the custodial petition in Superior Court? No. In family law practice if one parent were to abscond with the child without consent then you would file for an order Do you know what that D.C. law is? Is it a statute or a case? I believe it's 16- Maybe you could just tell me I would be happy to get that specific... Oh actually Your Honor, I'm not sure that I'm going to have to look and see if there's a specific statute that's on point to getting permission to leave. I'm not sure that there is a statute that says in the context that you need the permission in an initial sort of dispute where there's no court order that you need permission. But I can tell you based on the common practice that if a parent were to do that the other parent would march in and file an emergency order and the D.C. Superior Court would likely order the child returned immediately for one parent sort of absconding that way if it was a subversive move without permission. I'm just trying to understand. That's just a general rule of D.C. law or is that once a proceeding has been initiated in the Superior Court, then people aren't supposed to grab the child and the Superior Court has control? I think it's just sort of a well-known practice sort of understanding. We all know that if a parent were to do that, we could go in and likely get an order for the immediate return of the child from the local custody court. From the local custody court. I'm sorry, I'm not being clear. There's some talk on the record here that there was a plan to go back to France for I think it was Easter or something. Correct. And then that got scuttled at the last minute. And if Dr. Abouhaider had said, well, I'm sorry, you can't make it to his wife's work or whatever reason, but I'm going to go ahead and take the child with me just for Easter. There's Easter celebrations that we had all planned. Could she have gone to court and said he can't do that? So this is before any breakup, any announcement of separation, any filing? I think that question sort of highlights what her intent was. I'm not asking about intent. I'm asking as a matter of the law that you're talking to me about. Could he have said, I'm sorry, you're not able to make it to Ms. Vasquez? Would have loved to have you here for Easter. But we have all these plans with family and friends, and so I'm going to go ahead and take the child and then I'll bring her back at the exact same time we planned at the end of the Easter celebration. I believe that was offered to Dr. Abouhaider. Is that lawful? Yes. He wouldn't need permission from anybody to do that. Permission, if Your Honor is referring to Dr. Santa Vasquez, not under the current, not as the legal rights stood at that time. Once she filed the custodial petition, he couldn't have done that. He could have. Without her consent? If she had objected, she would have had the right to file a motion to block the trip and ask that the child not be permitted to leave the District of Columbia. Couldn't you say that that motion would be granted because that's the general practice? When you're evaluating, custody determinations are subjective, fact-intensive, generally it's around what's in the best interest of the child. When you get into issues where you have one parent that's taking action that is, you know, maybe in complete and utter violation of the other parent's right to... You're making a... You're trying to load the answer here. Okay. I'm sorry. It's not trying to do anything. She wants to get on a plane. I'm sorry. And then bring the kid back. Can he? After the custodial petition is filed, could he do that without her consent? If she objected and filed something... Exactly, without her consent over her objection. Up to the judge. Up to the judge. If she objected... If it's up to the judge, then that means no, he couldn't unless the judge gave permission. Well, would he be in violation of any law if he did that? No. Would he be in violation of what she wanted? Would she have the opportunity to do a service she wanted in a superior court litigation? Yes. But there's no legal violation. I wasn't aware that courts could order people to do things unless the law required them to do it. Well, in this case, it's sort of a... It's a... The nature of it is sort of... The nature of it being the custodial... It being, for example, taking a child somewhere, say, 300 miles away, even to, say, close to a nearby state, say, Pennsylvania or New York, if it's outside of the... If it's something that would, you know, sort of substantially affect the rights of the parent who's aggrieved, then the court... You know, and the child is moved there on a permanent basis. For example, if the child went to Pennsylvania instead of a foreign country, you know, the proper thing to do would be to file an emergency petition in the jurisdiction where the child was removed from and seek an immediate return. And when you have that order, now there can be... Potentially be criminal penalties, even though the authorities typically don't get involved in a criminal nature. But now you've got your order, and that is something that can help you get the child back. So that's just sort of the way that those sorts of situations are handled. All right. Sorry. We'll give you some time on rebuttal. Understood. Thank you very much. If you have that statute, then that would be helpful to me. Statutory side, then. Sorry. Just to clarify, there may not be one. Okay. If you don't, then that can be your answer, too. All right. Mr. Cullen? Your Honours, the statute is right at the very end of the D.C. Family Law rules. Unusually in D.C., there's a D.C. annotated set of rules, but right before that, there are lettered rules, and the very last rule is a statutory nay-exeat. And that statutory nay-exeat can be exercised by any Superior Court Associate Judge sitting in chambers on any given day. Because... Do you have a citation for that? It is Family Law Rule G, I believe. It's a very odd set of rules just for the family court right at the beginning of the civil rules. And that rule only kicks in when somebody has triggered the Superior Court process by filing a... Yes, but it can be done at the... It can all be done in chambers immediately. Right, but you'd have to have a proceeding initiated in Superior Court to have that. If she hadn't filed anything in Superior Court, and he said, OK, I'll just take her to France for Easter, could she have gone and gotten an order without filing something in Superior Court? Yes, because in practice, a complaint for custody, the underlying complaint is filed at the same moment that the statutory nay-exeat is exercised. But my question is, if she has no intention of ever filing anything in Superior Court, she's not going to file anything in Superior Court, she just doesn't want the child going with him for Easter. She has no intention, and she's not filing a custody complaint. She's filing nothing in Superior Court except a motion to make him bring the child back from France. Can you do that? Yes, in D.C. you can. It's a freestanding statutory nay-exeat similar to the statutory nay-exeat in the first Supreme Court case on the Convention, the Abbott case, where there was a statutory nay-exeat from Chile. And of course, what someone in Dr. Abuhaydar's position always would do is take proper advice, what is my remedy? Because the whole law of snatch and grab is what the treaty was designed to prevent. And had he just snatched and grabbed his daughter and got on the plane to France, that it is not unreasonable to think that there would be untold consequences for that, as opposed to seeking the proper remedy available to him, which is filing his Hague case either in federal court or in D.C. Superior Court. Untold consequences, you mean emotionally and... To the child, exactly. Because, Judge Pillard, at the root of this treaty is the well-being of the child. Great. And it's just trying to figure out what the best forum is, what the appropriate forum is when there is even potentially a conflict among different national or local forums. And I think the thing that is sort of, I struggled with at least at first, is this notion of a wrongful retention. We have to assume that France or some other country is at least in the picture as a potential habitual resident in order to get the analysis off the ground. And so we have these parents who have moved and maybe at the end of the day we say, okay, her wrongful retention is going to court in D.C. and saying I want custody and it could have even been an email saying, I want custody, you know, this is not working out. And then from that point you do the analysis of habitual residents. If it turns out that D.C. is a habitual resident, then there's actually nothing wrongful about the resort to D.C. court or her decision to break the marriage. People do it every day. But in order to have the inquiry even lift off, we have to call it a wrongful retention. Is that right? It's 100% correct. And you all asked about this timing issue. So I had a moment when I was listening to Learned Council's position this morning to go to our government's views on this. We did cite in our brief the United States government's legal analysis on the treaty. And so I quickly looked at the analysis. Page 15 really answers the question. Is that in the record here somewhere? Page 15 is not in the record. The legal analysis is cited as one of our secondary sources. And I can certainly do a letter after today pointing this out under the subsection. I'll do that. But please listen to what our government says. There are numerous reasons to proceed promptly. The two most crucial reasons to proceed promptly are, number one, to preclude adjudication of custody on the merits in a country that's not the child's eviction residence. And Judge Pillard, to answer your question from earlier this morning, and to maximize the chances for the child's return by reducing the opportunity to establish that the child is settled in a new environment, thereby impacting the child's well-being. Our government has said, you don't wait. You file. And the speed, which Justice Ginsburg, looking down at us, in her concurring opinion in Chafin, Chafin v. Chafin, the second Supreme Court case, Justice Ginsburg said, the reason we move these cases super fast, and the reason the United States has been criticized in the past of moving these cases too slowly, is at the root of this is the child. Yes, it's not a best interest analysis, but the well-being of the child is paramount, and you cannot, as you were posturing, I believe, in your question, Judge Pillard, allow time to pass, and the child to become more and more settled, and then take the child out of what may have become, after a great period of time, a situation that's too difficult for the child. And that is really what the Torim case is about, and as you saw in our brief, I went back and pulled the original complaint in Torim, and the original Middlesex County, excuse me, the Middlesex Circuit Court case out of Massachusetts. And the father waited too long in Torim. He waited more than a year, more than a year, to file his Hague case, thereby creating an exception, a defense, which only exists once the child has been settled for more than one year. What a way to make up the fact that your client sought the assistance of the French Central Authority and told them that his wife had said that she had no intention of returning with the child to France, and you agreed to remain in the United States until December 31st, 2019, so there is essentially no retention and we're not going to take any action. Now that, Judge Wilkins, is at page A-10-15, A-1-0-1-5, the English version in Volume 2 of the appendix. And you'll see that this is a document that we produced. In fact, my colleague Leah Houser's name is on the top of the email. The certified English translation is page A-1-0-1-5, and the original French is page A-1-0-2-1. So one page email... It's not his favorite thing to tell you about the translation that we have to worry about. No, nothing, nothing. And what I was going to say, Judge Millett, is we did the translation ourselves, because we wanted Judge Metta to be aware of this. So what we have here is an administrative email from a lady in the French Central Authority who makes the classic mistake that central authorities make. And the classic mistake is to look at the Hague application through the prism of France. But of course that's not what one does. You look at the Hague application with respect to what law would be applied to the petition in federal court here. And so it doesn't matter if Scotland has not yet recognized undertakings, which has been a huge issue in Hague cases over the years. It doesn't matter if the most recent country to join, Singapore, does not yet recognize certain areas of jurisprudence. What matters is, what does the jurisprudence of the requested country establish? And there's no expectation that... But we're here to decide what our jurisprudence establishes, and we have said that we look to what our sister country's signatory is. And France isn't new. No, France is not new. And so they seem to have a pretty firm statement here that there was no... In their view, they're looking at the same treaty we are, there's no wrongful retention, not just with her statements about consent, but having filed a custodial action. There's still no wrongful attention until the end of December 2019. Why shouldn't we respect that? Because that's not what our jurisprudence has established from Moses... I thought you were here because this circuit doesn't have jurisprudence yet on this question. This is an open question. Is it not in this court? Well, I would just... To answer that, I would say what you said to counsel, which was you're asking us to go against basically every other circuit except the Sixth Circuit. And that's I think... So we don't have settled jurisprudence in this country. Well, that's true, because if you took the map of the United States, you could point to certain circuits that have tweaked and manipulated the analysis of habitual residence. But when it comes down to it, only the Sixth Circuit has done that. But now habitual residence is used before the Supreme Court as well. And so we're supposed to do this on a fast basis. It doesn't matter in this case, because whether... The primary question in tallying, the oral argument is next week. The primary question in tallying is what standard should we apply? What's the standard? And of course the Supreme Court decides the standard is a clearly erroneous standard. That makes no difference in this case. But another issue in that brief is if the Solicitor General's brief addresses how habitual residence should be analyzed and seems to disagree with the Moses approach and says look at just everything. Don't give particular... You can look at subjective intent, but don't give that... The parent's subjective intent. Don't give that any more weight than anything else. It's just one factor in the mix, which is not the Moses approach. It's not the one that I understood the parties to agree governed this particular case. It's kind of confusing then to say we should ignore the French authority in this process too. To go back to that, the treaty requires the central authority to do is set out in Article 9. And it is categorical and it is mandated. What is stated in this email is in conflict with Article 9 of the treaty. Because Article 9 of the treaty is very short. It says if the central authority which receives the application... Article 9. Article 9 of the treaty. If the central authority, and that's what we have here, which receives the application has reason to believe the child is in another contracting state, which the child is, it shall directly and without delay transmit the application to the central authority of the contracting state. Even if they don't think there's any merit to the application. This is not open to dispute. Article 9 mandates and the reason for this, one has to go back to what are called the travel preparatoires in the 1970s. Professor Cromwell Adair Dyer who was the United States delegate, who really came up with this brilliant idea. Which was, how can we stop the mischief? The mischief being unilateral action by one parent that changes the status quo. And it was anticipated because this is very new law, that it would take some time for contracting states to come in line. And so Article 9 is crafted to say, France, you may not do what you're saying you're going to do in this email. You should have, as required by the treaty, and as Justice Kennedy says in Abbott, he said this is a text-based treaty. You may not monkey around with this language. It's text-based and that's what you've got to do. And so the French Central Authority should have transmitted it to the US Central Authority. Just so you know, judges, the reason that is typically done is because Article 30 of the treaty gets round the authentication rules and hearsay rules for foreign documents. Because as you know, under our federal system, it's quite difficult to get foreign documents into evidence. And so Article 30 says, if you have a document in the federal  legally binding to the federal authority. Anything you attach to it, it could be a plate of spaghetti, it could be the best haggis you've ever tasted in your life, if you attach it to that application, you no longer are bound by rules of authenticity and admissibility. And that's why this is done. So I get your argument that they should have done it or not. My question is, there's a statement here that seems to be the view of the French Central Authority on whether a wrongful retention occurs prior to January 1, 2020. Is that statement reflective of French law? Is that an accurate, whether they should have done it or not? Is that an accurate statement of the French government? Well, I can only tell you what the French experts told me. It's the only way I can answer that. And that was the expert who did the affidavit of French law. And her position is that is wrong. It's also wrong as a statement about the French government's view. You're not aware of cases or decisions or anything? She said that this is just completely wrong. But we don't have that in the record. No, that's not in the record, but it became much ado about nothing. And the reason for that is the application to the French Central Authority, I believe, was made on June the 6th. The petition for return was made on June the 10th. The treaty and our government says these are not mutually exclusive positions. Then Judge Mehta moved this case at a rocket speed and by June the 17th had entered, I believe it was June the 17th, had entered a scheduling order saying we are going to have a hearing in Stinter. And it was only then, if you look at this email, on June the 26th that this email came back from the French Central Authority. So by then, Dr. Abu Haidar had activated his not mutually exclusive position by going straight to federal court here and pursuing his petition for return. It's not the case that this email came in and then oh, we better try some different approach. We're worried about this email. This email is not a concern because it is one administrative individual in a central authority who is acting ultra-virus. Would you have had an opportunity to seek review of this email if you had decided to continue on this path rather than pursuing a petition in the United States? Yes. Our government says you are expressly allowed to do that. Our legal analysis from our government says if for some reason an application is initially rejected you must be given the right to resubmit it. You have to. And that's in the legal analysis. When you resubmit it does somebody else look at it? I don't know exactly how the French central authority operates but what we do know when I say acting ultra-virus is what a central authority is allowed to do is be limited by Article 9 and restricted by Article 7. If you look at Article 7 it lays out in sub-paragraphs A through G what a central authority is allowed to do. The main role of a central authority is to locate a child and our central authority can use federal law enforcement to help locate the U.S. Postal Inspector and in this country the other main role of our central authority is to locate counsel because it is very difficult for parents in other countries A. to find counsel and B. to afford counsel in this country. When you look at Article 7 you'll see these are purely administrative duties that the right to file in court the judicial remedy is always paramount. What I'm trying to understand is what it seems to me that what you're saying is that the only role for the French central authority here was to ascertain if the child was in the United States then to forward this petition to the United States central authority. So in Article 7 that's where it says that one of the responsibilities of central authorities is to initiate or facilitate the initiation of a judicial or administrative proceeding with a view to obtaining the return of the child. You're saying that it wouldn't have been France's role to determine whether France should have a proceeding itself to determine whether the child should be returned from the United States that only the United States central authority would have that proceeding. That's correct because most other countries are under the misconception that you can file a Hague application that it gets transmitted to the State Department and the State Department will put the child back on a plane to the other country. What central authorities actually are empowered to do is extremely limited, particularly in this country with the division of powers. There's only three affirmative actions our central authority can do. Number one, they can write a letter to the custody court telling them they can't proceed because there's a Hague case pending. Number two, they can write a letter to the federal or state court or district judge who's handling the Hague case saying here's some useful links to help you learn how to judge a Hague case. Number three, they can write a letter which they hardly ever write to a panel or to a district court judge saying you're not moving fast enough. That is it. There is nothing else the central authority is able to do unless the child is missing and then the central authorities can seek the assistance of each state's missing children clearing house which by federal law can go to school records and pediatric records and try to locate a child. Do the central authorities have any interpretive role or is that limited to the French courts? Limited to the French courts. So the central authority's statement about what it thinks the convention requires, that there's nothing you can do here because you agree until December 31st, they had no authority to offer that interpretation. That's right, and that's why I say this lady was acting ultra-virus. She could not, and as you see under Article 9, she could not ignore the plain text of the treaty. She had to. She had to do that. No, but it's a separate question of whether the central authorities, just aside from this letter, are conferred any interpretive role under the treaty. No, that is covered by Article 15. That's a pardon. I'm sorry. Don't apologize. I'm sorry. Article 15 tells us that courts do the interpretation. Article 15 tells us Oh, 1-5 or 5-0? 1-5. Article 1-5. Article 1-5 says if the courts prime the Hague case determines that it might be helpful to get a view from the other country, then an Article 15 request can be made to the other country. That request has happened one time. One. One time in the United States since we ratified this treaty in 1988. One time. Judge Motz in the U.S. District Court in Maryland asked another government to ask their courts to give a view on a particular issue. And guess what the other countries said? We can't tell our courts what to do. There's no way. And our own government in its legal analysis says Article 15 will hardly ever be used. And really what happened, Judge Motz, to answer your questions dead on, is the Permanent Bureau of the Hague Conference The what? The Permanent Bureau of the Hague Conference, the governing body for this international private law issue, developed a database for all the cases. And so everything is in there. It's called INCADAT. And so there was no need for the Article 15 remedy. And that's really what happened. You mentioned, Judge Millett, the government. And the case next week, Talgary v. Monaski. The government's position is not at all inconsistent with Moses. Chief Judge Kuczynski in Moses said, this is fact-driven. Yes, we have an analysis, and we have a paradigm now, and we have a way of approaching it. But it's a mixed question of fact and law. What the government says in the Solicitor General's brief in Talgary v. Monaski is that you consider all the admissible evidence, and this is a flexible and fact-bound analysis. And that is exactly what Judge Meta did. To be clear, they don't cite Moses, which I thought was a bit telling. And they go on to say the subjective intent of the parties, which is what Moses starts with, cannot be determinative, and is at best one fact to think about. But it cannot be necessary or sufficient or even carry any more weight than any other fact. That's how I read their brief. And the Moses analysis, which my understanding is you all have agreed governance here, so that may be the end of it for us. But the Moses analysis certainly makes subjective intent sort of the starting point. And it says application can be considered as well. Maybe that could overcome it, but it seems like a rare circumstance. Yeah, I agree with that. And what I was going to say is what Judge Meta did is exactly what the government says should be done. Because it's very helpful. It's pages A166 and 167. And they open beautifully in the first volume and they're side by side. And if you look at page 166 and 167, Judge Meta says for a whole host of reasons the habitual residence, the customary home of this child is obviously France. And he goes through 16 different compelling factual reasons. 16. 16 saying why there's no possible doubt that France remains the customary home of this child. And those 16 views take in documents, data, evidence, and he assesses the credibility of the parties. And he goes very deep on that. He says it's not just issues like they have non-immigrant temporary G4 visas. It's not just the fact that they have only an 18 month contract. But all their worldly possessions are stored in two containers in Paris. And he had photographs of them all. And the best man from the wedding, Geronimo Rapopulos, and their other best friend from Italy both said everyone knew this was an 18 month detachment. If you veer away from that, here's what would happen. I'll just pick a new judgment. You get a chance to do a sabbatical at the law school at the University of Edinburgh. The weather's a bit challenging from time to time. So you get to do that and you decide to take your family. And for whatever reason, matters do not advance at home as you had anticipated. And the other side decides to go to the sheriff court and ask the sheriff in Edinburgh to issue a custody order. Well, your sabbatical, your détachement, is clearly not your customary home. And if you take that view further, Judge, then anyone who goes on a posting for foreign service is giving up the right to litigate their most important part of their lives, their family, in the United States. That cannot be the case. So, the brilliant treaty came up with a solution. And the solution is you must prevent unilateral action. And that's what Madam Respondent did. And it's not just her. She instructed very competent counsel, and this is in Petitioner's Exhibit 16, which is the very last document in Volume 2 of the appendix. And you were right, Judge Millett, counsel for Madam Respondent said, we're changing the locks. You may not come back into this family home. You are out of here. Also, the only place Dr. Abu Haidar can practice medicine is France. How could he possibly be relocating here? And he made the effort to come backwards and forwards from his home in Paris to here during the period of detention. The last thing I did want to say, I'm keeping you all from your sandwiches. Go ahead. If they had, if the court had found that they had abandoned France as a habitual residence, but they had not yet established and agreed upon habitual residence, he didn't agree on the U.S. Maybe he was thinking Spain or Uruguay or whatever. What happens? It's habitual residence of the child, first of all, correct? What happens if one's abandoned before another one's established? Can that happen under the treaty? Well, there's one district court that has taken the view that you can have no habitual residence. So what happens then? You can't be wrongful anywhere? Then there would be no remedy under the treaty because the treaty is based on the concept of habitual residence. And it's no different from the attempt in the Third World War where an additional defense of unclean hands was attempted to be interposed. And you can't mess with this treaty, as Justice Kennedy said in Abbott. It's a text-based treaty. It's based on habitual residence. If, in some extraordinary case, there is no habitual residence, then there's no treaty remedy. But that can't be right because you can't leave someone in the position of Dr. Abu Haidar having no remedy. Because that cannot possibly be in the child's well-being, which is the whole purpose of this treaty. The other question I had is she filed a petition for changing custodial rights in D.C. Superior Court, but that hadn't yet been adjudicated. Did his custodial rights change under French law at all? Have they changed at all this year? No. The concept in the European Union is a concept of parental authority or parental responsibility. It is not really how we understand the words custody and visitation. But, of course, that's the great thing about this because this treaty assumes all types of rights and obligations relating to children. Under French law, he still had equal rights. And that goes, Judge Pillar, to your question about wrongful retention. Because once you establish that there is wrongful retention, then the question is, okay, where was the habitual residence? France. Okay, at the time of wrongful retention, when habitual residence was still France, did he have rights under French law, even if they're just joint rights? That's all he needs. And he did. Whereas, what he did was an attempt, which our government says is to be avoided, and we have to act super fast to prevent this, another court usurping the proper jurisdiction of France. That's what happened. I agree with you all. It's not really an abduction treaty. In fact, the word abduction is only used in the title, and it was a last-minute idea by the Canadians to sensationalize this treaty in a good way, to get attention to this extraordinary mechanism. It is a case of forum, what is the correct forum, and the two issues of wrongful removal, when someone's taken from one country, and wrongful retention, when one is retained. And there are a myriad number of ways in which our courts have developed the idea that any type of unilateral action triggers wrongful retention. Then we look at habitual residents. Did that parent have rights in that country at that moment in time? And Dr. Abu Haidar absolutely did. I disagree with my learned friend because the most recent case by Chief Judge Jordan, the Palencia case, is absolutely on point. The question that Chief Judge Jordan explained is it's all about timing, and you look to when did the left-behind parent realize what was going on? Well, Dr. Abu Haidar realizes what is going on when he's having breakfast, there's a knock on the door, he's served with a foreign custody case, and then thrown out of his home. That's enough. Even the letter, even if it was just the petitioner's Exhibit 16, the letter from counsel, just that would be enough. So when they talk about the third prong, there's some discussion here about whether they preserved an argument on that, the third prong that focuses on a change in custodial rights, what that means is simply an attempted change? Yes. You don't actually have to have a legal change in custodial rights to trigger a wrongful retention. Spot on. That is exactly right. And that's why practitioners of the Hague try to get their affidavit of foreign law into the record as early as possible. You'll see in this case long before we got to the trial we had filed the affidavit of foreign law so Judge Mehta could see what rights he was actually going to be dealing with. But a joint right is enough. Under Palencia, an obligation is enough. If you have an obligation to your children to care for them, that is a sufficient right. Why? Because this treaty is brilliant. Because Article 5 says, when we talk about rights, it's a semi autonomous concept. Don't get tied down in Scottish values and Scottish mores. You've got to look at this in the broadest possible way so every possible case can be brought under this treaty. Because there's no downside to Madam Respondent. Child goes back, they go back to France, they sort it out then. Imagine the downside to Dr. Abouhaider. He doesn't live here. How could he possibly litigate a case in B.C. Superior Court? Is part of the custodial rights the form in which custodial rights will be determined? Is part of the custodial rights the right to have custody decided by, under your theory of the case, France? Yes. That's recognized as a custodial right. Yes. Actually, helpfully, that email at page A-10-15 acknowledges that as well. He says he has parental rights under First Law. Thank you very much. Mr. DiPetro, you didn't have any time left. We'll give you a couple of minutes. Two minutes. One issue that I would like to draw attention to is there seems to be a great deal of focus on the Dr. Abouhaider's career and where he's licensed to practice medicine and his commute. What about the trajectory of both of their careers as they move to the United States? This was an amazing step forward for Dr. Sandevazquez. They moved here for her opportunity. They anticipated it being longer. They specifically negotiated it being longer than 18 months. They took steps to make arrangements for what would happen after the renewal of the first contract in three years. Specifically, he started the process of registering his medical license in Uruguay. There's evidence in the record that demonstrates a clear intent away from France. I think the district court focused on essentially said, I don't think they did enough to show that Washington, D.C. was their permanent home. That's essentially what the opinion says. They, as Judge Millett just described, they don't have to supplant the former habitual residence with a new habitual residence and are to abandon it. And Moses... But they need to have a habitual residence because that's what determines the appropriate form. They... Right, if D.C. is not the habitual residence, she can't file here. I'm sorry? If D.C. is not the habitual residence, as you're arguing, they may have given up France, but they didn't have one here yet, she can't file here either. Well, we're arguing that they did have one here. When you say file, Your Honor, if I could just ask for clarification as to whether you meant custody and local quarter and... That's what you meant, correct? So actually she could because habitual residence has nothing to do with... The jurisdictional statute in the United States has been adopted by, I believe, nearly every state if not all of them at this point. The Uniform Child Custody Jurisdiction Enforcement Act... So you're saying that the jurisdiction where they filed doesn't have to be the jurisdiction the Hague Convention would select. It just has to not displace a different jurisdiction that the Hague Convention would select. They're mutually exclusive in a sense, but they're sort of related. I thought you were saying they weren't. Well, if I could clarify the UCCJA refers to it as home state. It's not the same as habitual residence. Habitual residence is a term of art in the treaty. It's used in other European laws, both local laws and EU laws. Here it's, the UCCJA refers to home state. All that's required is residency for six years. There's also lots of exceptions, jurisdictions litigated frequently. Is there any case that has held there is no habitual residence for purposes of the Hague Convention and therefore that it just defaults to whatever forum the party files in? Which I take it to be what you're arguing. That there's no jurisdiction for... There's no habitual residence within the meaning of the Hague Convention and therefore it's not in opposition to any forum that the convention would select for the party to file in the home state. Meaning there's no breach of custody rights? Meaning that we don't look at the Hague Convention's analysis. I thought that's what you're arguing. You don't have to establish that DC is the habitual residence as long as the choice of DC is not in derogation of a different habitual residence. Is that not the point you were just making? I believe that's correct. What I'm saying is you can abandon the convention in France without... France does not... France does not... The United States does not have to be habitual residence or to abandon France. In this case I'm arguing of course that it is and when the law in Moses also says that when the family moves as a unit and establishes a permanent home, the time you establish that habitual residence need not be long. All right. All right. Would the... Could you have a wrap up? I'm sorry. Certainly. Just that the breach of custody rights must not simply be an attempt. It has to be to satisfy Step 3, an actual breach. We're arguing this is kind of along the lines of participatory retention you can't have. A participatory claim, an in code claim if you will in the civil law context if there is one. Also the central authority, I believe the role of the central authority was quite diluted by counsel's argument and that I would refer the court back to the Perez-Vera report which is an official opinion of the executive branch is the seminal report with respect to interpretation of the treaty expressly says central authorities can reject petitions that are manifestly without foundation. And in the context of this treaty... Are you talking about the same executive branch interpretation here? He was referring to the treaty itself. I'm referring to the report that interprets it. Is that on the record here? Absolutely. The Perez-Vera report is a document I'd like to direct the court's attention to. It's mentioned in our brief, cited in our brief to my opening brief. We don't have it here with us right now. The Perez-Vera report is actually, I believe it should be in the back of our brief. I'll find it then. The reason that we spent several pages addressing the role of the central authority which operate at the level of bilateral relations among member nations so the Department of State, Office of Children's Issues, the Ministry of Justice in France, their opinion should be entitled to greatly. And I'm taking, I believe that perhaps I should conclude at this time based on my impression of the bench. Thank you very much. Thank you very much. The case is submitted. The case is submitted. The case is submitted. The case is submitted.
judges: Millett, Pillard, Wilkins